United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PABLO CASTANEDA,

           Petitioner,

    v.

BRENDA CASH, Warden,

           Respondent.

Case No. C 11-4708 WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

        Petitioner Pablo Castaneda, a California prisoner, filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his conviction in state court. Respondent was ordered to show cause why the writ should not be granted based upon the following claims: (1) ineffective assistance of counsel; (2) insufficient evidence to support the burglary conviction; and (3) Confrontation Clause violation. Respondent filed an answer with a supporting memorandum of points and authorities. Petitioner has filed a traverse. For the reasons set forth below, the petition is DENIED.

## STATEMENT OF THE CASE

**I.    Procedural Background**

        On August 28, 2007, a Monterey County Superior Court jury found Castaneda guilty of robbery, burglary, receiving stolen property, and possession of a firearm by a felon and found true that Castaneda personally used a firearm and had one prior strike conviction and two prior prison terms. On July 25, 2008, the trial court sentenced Castaneda to twenty-four years and eight months in state prison.

        On February 18, 2010, in an unpublished opinion, the California Court of Appeal affirmed the judgment. (Exh. 7.) On June 9, 2010, the California Supreme Court denied

1    review.  (Exh. 9.)  This federal habeas petition followed.

2    **II.    Factual Background**

3         The Court of Appeal summarized the facts of the case as follows:

4              Around 6:45 p.m. on December 16, 2005, Tamara Stickler
             walked from the Pacific Grove Safeway store to her car in the
5             store's parking lot.  She had her purse on her arm as she put her
             groceries in the trunk of her car.  Her purse held a wallet and
6             checkbook, approximately $600 in cash, a cell phone, a $50
             Gap gift card, and two Ann Taylor Loft gift cards, one for
7             $150, and one for $50.

8              Stickler felt a tug on her purse and, when she turned around, a
             man wearing a dark ski mask was standing there.  Stickler
9             estimated that the man was between five feet ten inches and six
             feet tall.  The ski mask had holes for the man's eyes and
10            mouth.  The man pointed a revolver at Stickler and said "give
             me your purse."  He took her purse off her arm, got into the
11            front passenger seat of a light-colored sedan that was a few feet
             behind him, and drove away.  Stickler could not see the driver
12            of the car.  Although she was unable to determine the car's
             make and model, the car sounded to her like the Honda she
13            used to have.  She reported the robbery to the police.

14             Reginaldo Aquino owned a light brown 1991 Honda Accord
             sedan in December 2005.  On December 16, 2005, Aquino
15            drove his Honda to the Monterey apartment of Jackie Garza
             FN4 around 2:45 p.m.  The apartment is about one mile away
16            from the Pacific Grove Safeway store.  Jackie, her daughter
             Nikki (who was Aquino's girlfriend), defendant, defendant's
17            brother Frank Olvera, defendant's girlfriend Darlene Garabai,
             Cathleen Reynosa, and Tony Meija FN5 were at Garza's
18            apartment.  Aquino stayed at the apartment to get a tattoo from
             Olvera and defendant, and he gave the keys to his Honda to
19            Jackie.  Jackie and Garabai left the apartment, and a few
             minutes later Reynosa and Meija left.  After about 25 or 30
20            minutes, Aquino left the apartment and walked to work.  He
             remained at work until around 9:45 p.m.  When he returned to
21            Jackie's apartment, his Honda was not there.  Jackie, Nikki,
             defendant, and Olvera were at the apartment.  A few minutes
22            later, Reynosa and Meija arrived, and Reynosa gave Aquino
             the keys to his car.

23             FN4   As Jackie and her daughter Nikki have the same last
24            name, in order to avoid confusion we will refer to them by their
             first names.

25             FN5   Meija is also referred to in the record as Mejia.

26
             On December 17, 2005, defendant and a woman went to the
27            Ann Taylor Loft store in the Del Monte Shopping Center.
             Defendant handed Amy Jones, the manager of the store, two
28            gift cards and asked her how much was on them.  Jones told

United States District Court
Northern District of California

defendant how much was on each card and handed them to the woman. One gift card was for $150, the other one for $50. Jones then assisted the woman as she tried on various items over the course of at least one hour while defendant talked on his cell phone. Defendant and the woman purchased some items using the two gift cards, including items that were later found during a search of Jackie's apartment. The $150 gift card had been purchased with Stickler's debit card on November 11, 2005. Jones later identified a photo of defendant in a lineup as the man who assisted in the purchase of the items bought at her store on December 17, 2005.

On December 18, 2005, officers stopped Aquino in his Honda and told him that the Honda had been used in a robbery. The license plate number on the Honda was similar to the plate number reported by witnesses to the robbery. Officers found a plastic toy semiautomatic gun under the spare tire in the trunk of the Honda. They seized the Honda. . . . .

Pacific Grove Police Commander Thomas Uretsky began surveillance on Jackie's apartment around noon on December 18, 2005. The officer saw defendant drive up in a Mazda RX7 coupe around 12:30 p.m. and enter the apartment. Through the front apartment window, the officer saw defendant talking to Olvera in the living room. Defendant, Olvera, Jackie, and Garabai then came outside and looked at the Mazda. Jackie gave Garabai some money and Garabai and Olvera walked away. Garabai and Olvera were detained by other officers. Commander Uretsky went to Garza's apartment and contacted Jackie and defendant outside. Defendant was arrested and removed. He had a mustache and a goatee. His booking sheet lists his height as five feet nine inches.

Commander Uretsky went inside the apartment with Jackie and found Nikki, Meija, and Reynosa. Reynosa and Meija gave false names. Meija is about five feet six inches tall. Meija was arrested and removed. Commander Uretsky had other officers "hold the scene" while he obtained a search warrant for the apartment. Those officers allowed Reynosa to leave the apartment while Commander Uretsky was gone.

The search warrant was executed around 11:30 p.m. on December 18, 2005. In the living room, right inside the front door of the apartment, were bags from the Gap and Ann Taylor stores. The bags contained newly purchased items from both stores. On the top of the contents of an open black handbag by the coffee table in the living room was a black ski mask. Inside the ski mask was a loaded .38 caliber revolver. By the living room's patio door was a brown and black bag containing several cell phones, a cell phone battery pack, a cell phone memory card, and male clothing. One of the cell phones and the battery pack and memory card were Stickler's.

Stickler was asked by the Pacific Grove Police Department to identify her cell phone, and she did so. Her cell phone bill reflects that her cell phone was used to make calls from 7:27

3

p.m. on December 16, 2005, to December 18, 2005.

Megan Kinney, a criminalist with the California Department of Justice (DOJ), received a DNA sample from defendant, and the ski mask, the revolver, and some cartridges.  She swabbed the revolver and cartridges in an attempt to collect DNA.  She collected some possible hairs from the ski mask, swabbed it for possible DNA, and took a cutting from its nose, mouth and chin area.  She then repackaged the items and her samples and sent them to the Richmond lab for analysis.  Margaret Aceves, a criminalist supervisor at the Richmond lab, received the swabs from the revolver and cartridges and the cutting from the ski mask.  The ski mask cutting had DNA from three individuals.  Defendant could not be excluded as a possible contributor to one of the two major DNA profiles from the ski mask.  The other major DNA profile belongs to Meija.  Defendant and Meija could be excluded as major contributors to the DNA detected on the revolver.  The DNA on the cartridges was insufficient for comparison.

Linda Senteney, a latent print analyst with the DOJ, examined the .38-caliber revolver and cartridges, but did not develop any latent prints on them.

CDs of recordings of some telephone calls defendant made from jail were played for the jury.  During a phone call defendant made at 10:57 p.m. on December 18, 2005, to Daniel Lujan, defendant asked Lujan to call Reynosa.  Lujan relayed information from defendant to Reynosa and from Reynosa to defendant.  Defendant said that a gun was in Garabai's purse in the apartment.  Lujan said that Reynosa responded that the police were going to find the gun during their search.

During a phone call he made at 12:51 a.m. on December 19, 2005, to Reynosa, defendant asked Reynosa, "Was there any checks or anything in there?"  Reynosa said that she had "stuffed everything in that heater."  Defendant asked, "You think they'll find it?"  Reynosa responded "I don't know, I hope not."  Reynosa said, "I didn't stash that thing.  I didn't stash the toy." Defendant said, "I'm talk, I'm talking about that lady's stuff."  Reynosa responded, "I know, well I don't know how far Nikki put it in there."  "How ever far it got put in there.  I don't know, Nikki put it."  Defendant said that "if they find um . . . any kind of contraband belonging to that lady and that kinda like fucks up, you know what I mean?"  Reynosa said that she looked into defendant's bag and "I seen the phone, so I took the . . . chip out and everything."  "I . . . took the battery out."  "And I . . . , and I just like threw it.  So it's all like scrambled in there in everything."  Defendant said that the gun was in Garabai's bag, and that Garabai and Olvera were being charged for "that robbery over there at Safeway."

During a phone call he made at 12:22 p.m. on December 19, 2005, defendant told Jackie that the police wanted to charge Garabai with "all that crap, burglary and everything."  Jackie said that the police had impounded Aquino's Honda and

4

defendant asked, "How'd they get that car?"  "How in the fuck did they know about him?"  Jackie responded that she was not sure.  Defendant asked, "Did he tell the cops when when [sic], who came back with the car?"  Defendant told Jackie that if Aquino left his car with her when defendant was there, and the car was not there when Aquino returned but defendant was, then Meija would be "put[ting] himself on the spot" by "trying to get the blame off of him."  Defendant said that the police wanted to charge Garabai and him, and that they were fingerprinting the gun.  Jackie said that Garabai "is saying it's hers."  Defendant responded, "I know. . . ."

During a phone call he made at 12:39 p.m. on December 19, 2005, defendant asked Jackie what was found.  Jackie responded, "just the gun and the bag and the the nah uh, no ski mask, . . . your guys clothes."  Jackie said that "they went through everything, they tore my house upside down."  Defendant asked, "Did they find anything that had to do with that lady's shit?"  Jackie responded, "Uh phone, that's what they were looking, they were looking for a phone, credit cards. . . ."  Defendant asked, "Did they find any of that?"  Jackie responded, "Uh, no."  Jackie said that the police were "looking at the Ann Taylor card," and that they got "[t]he black leather purse and all that."  Defendant asked, "They got the . . . Ann Taylor[?]"  "Did they did The Gap?"  "They took that stuff too?"  "From the Gap?"  Jackie responded, "yeah they did. . . ."

The parties stipulated that when defendant was measured on August 27, 2007, in shoes, he was five feet seven and three-quarter inches tall.  Without shoes he was five feet six and three-quarter inches tall.  The parties further stipulated, for the purpose of the allegation that defendant was a felon in possession of a firearm, that defendant had previously been convicted of a felony.

(Exh. 7 at 2-7.)

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

here

1   light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

2        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

3   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

4   of law or if the state court decides a case differently than [the] Court has on a set of

5   materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13

6   (2000).

7        "Under the 'unreasonable application' clause, a federal habeas court may grant the

8   writ if the state court identifies the correct governing legal principle from [the] Court's

9   decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at

10   413.  "[A] federal habeas court may not issue the writ simply because that court concludes

11   in its independent judgment that the relevant state-court decision applied clearly

12   established federal law erroneously or incorrectly.  Rather, that application must also be

13   unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application"

14   inquiry should ask whether the state court's application of clearly established federal law

15   was "objectively unreasonable." *Id.* at 409.

16        When there is no reasoned opinion from the highest state court to consider the

17   petitioner's claims, the court looks to the last reasoned opinion from the state courts. *Ylst*

18   *v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  The last reasoned state court decision on

19   Castaneda's claims is the decision by the California Court of Appeal on direct review.

20   (Exh. 7.)

21                                    **DISCUSSION**

22   **I.    Ineffective Assistance of Counsel**

23        Castaneda claims that defense counsel rendered ineffective assistance by failing to

24   (A) request a mid-trial continuance to present testimony from Garabai; (B) investigate and

25   present testimony from Nikki Garza; and (C) object to the chain of custody of the DNA

26   evidence.

27        Claims of ineffective assistance of counsel are examined under *Strickland v.*

28   *Washington*, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of

6

counsel, the petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an objective standard of reasonableness under prevailing professional norms, "not whether it deviated from best practices or most common custom,"  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland*, 466 U.S. at 690 ).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 787 (quoting *Strickland*, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citing *Strickland*, 466 U.S. at 693).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).  It is also unnecessary for a court to address the prejudice prong of the *Strickland* test if the petitioner cannot establish incompetence under the first prong.  *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Richter*, 131 S. Ct. at 788 (quotation and citations omitted).  "The question [under § 2254(d)] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

United States District Court
Northern District of California

**A. Failure to Request Mid-trial Continuance**

Castaneda claims that defense counsel rendered ineffective assistance by failing to request a mid-trial continuance in order to find Garabai and have her testify that the gun belonged to her.

The Court of Appeal summarized the circumstances of this claim as follows:

> Garabai was charged, along with defendant, in the amended information with burglary (§ 459; count 2) and receiving stolen property (§ 496, subd. (a); count 3). On August 20, 2007, the court denied the prosecutor's motion to sever defendant's and Garabai's trials. The prosecutor then moved to dismiss the charges against Garabai "without prejudice, and with the anticipation of refiling," and the court granted the motion. The court and the parties then began the jury voir dire.
>
> Voir dire continued on August 21, 2007. After the jury panel and three alternate jurors were sworn in, and outside the jurors' presence, the court heard defendant's in limine motion to admit as an admission or a declaration against penal interest a statement made by Garabai to police officers that the revolver found in Jackie's apartment belonged to her. The court found that Garabai was no longer a party to the proceedings, so her statement could not be admitted as an admission. (*See* Evid. Code § 1220.) The court further found that defendant had not established that Garabai was unavailable as a witness in order to admit her statement as a declaration against penal interest. (*See* Evid. Code § 1230.) Therefore, the court ruled that the parties could not refer to Garabai's statement in their opening statements to the jury.
>
> Defendant asked for "a continuance in order to brief that issue because this was a surprise to us that there was a dismissal after the motion. We had our defense strategy planned. . . . We thought certain that this evidence was going to come in against Ms. Garabai, who was our codefendant up until yesterday. So we ask the Court to allow us a continuance to brief this issue thoroughly and subpoena Ms. Garabai to make a determination whether or not she's going to take the Fifth in this case." The prosecutor asked the court to deny the motion. . . . .
>
> The court found that "whatever prejudice there may be to the defense by not getting to refer to that particular statement in the opening statement is outweighed by the undue amount of time it would consume to start delaying the case at this stage. We put the jurors through the ringer for a day and a half. I really want to get this thing on the road. That's not to say at some point the Court may entertain the motion for a continuance, if necessary. For instance, to get the witness here. We don't know where she is, if she's available. We don't know where her attorney is. I can see this thing going on for days and days just trying to get this point settled. It's not like this is closing

1      argument.  This is the general introduction.  And I'm sure
       counsel has had enough experience to be skillful to work
2      around, give the jury the message without saying the magic
       words.  The motion is denied."

3      During his opening statement, defendant's counsel told the jury
       that the evidence would show that "even though they do have a
4      gun, that gun came out of the purse of Darlene Garabai.  It
       came out of the purse of Darlene Garabai.  They didn't take
5      this gun off of Mr. Castaneda, they found it in somebody else's
       purse.  And they show that when they checked it, hoping that it
6      belonged to Mr. Castaneda, they came up empty.  In fact,
       there's nothing that connects Mr. Castaneda to this gun.  The
7      gun, if anything, is connected to Ms. Garabai."  Counsel also
       told the jury that defendant admitted being with Garabai when
8      she purchased the items at the Ann Taylor Loft store.  "So we
       do know that the gun was found in Darlene Garabai's purse,
9      and that [defendant] was with her when she made purchases.
       That is what the evidence will show.  That is the level of
10     culpability that the evidence will show that Mr. Castaneda
       has."

11
       Defendant did not call any witnesses in his defense, and his
12     counsel did not later request a continuance in order to bring in
       Garabai to determine if she would refuse to testify.
13

14     (Exh. 7 at 9-10.)

15          The Court of Appeal concluded that counsel's failure to request a mid-trial

16     continuance was not prejudicial.  This determination was not objectively unreasonable

17     because there is no substantial probability that, absent this error, the jury would have had a

18     reasonable doubt respecting Castaneda's guilt.

19          First, any testimony from Garabai that she owned the gun would have been

20     cumulative to the evidence the jury heard in the tapes of Castaneda's phone calls from jail,

21     where he stated that Garabai admitted that the gun belonged to her.  The jury also heard

22     evidence that the gun was found in Garabai's purse.  In his opening statement, defense

23     counsel emphasized that the gun was found in Garabai's purse and that no evidence

24     connected the gun to Castaneda.

25          Second, the evidence that Castaneda robbed Stickler was strong.  Stickler was

26     robbed by a man and Castaneda was Garabai's boyfriend.  In the purse that was stolen,

27     were Stickler's cell phone, a Gap gift card and two Ann Taylor Loft gift cards.  Castaneda

28     and Garabai had access to the car used in the robbery and Castaneda could not be excluded

United States District Court
Northern District of California

9

from the DNA found on the ski mask used in the robbery.  The second day after the robbery, Castaneda and Garabai were seen at an apartment where items purchased at the Gap and with Stickler's Ann Taylor Loft gift card, Stickler's cell phone, a ski mask and a gun were found in the living room.  The ski mask and gun were found together in Garabai's purse.  Castaneda admitted that he accompanied Garabai to the Ann Taylor Loft store where they purchased items with the gift card stolen from Stickler.  In one of his telephone conversations from jail, Castaneda said that he knew that the gun was in Garabai's handbag.

In light of this evidence, Castaneda has failed to show that, even had counsel moved for a mid-trial continuance to subpoena Garabai and she had testified that the gun belonged to her, there is no reasonable probability that the result of the jury's verdict would have been different.  Thus, the state court's determination of no prejudice was not objectively unreasonable.

## B.    Failure to Investigate

Castaneda contends that counsel was ineffective for failing to conduct any investigation on his case and, in particular, for failing to interview Jackie and Nikki Garza because their testimony would have shown that he was at Jackie's apartment at the time Stickler was robbed.

The relevant facts pertaining to the claim from the Court of Appeal's opinion is as follows.  After trial, the trial court relieved trial counsel and appointed new counsel who filed a motion for a new trial contending that trial counsel had been ineffective for failing to investigate.  Attached to the new trial motion were declarations from Jackie and Nikki Garza.  (Exh. 7 at 13.)  In her declaration, Jackie stated that she would have testified that, on December 16, 2005, Castaneda was in her apartment the entire evening, but that Reynosa and Meija left and did not return until about 10:00 pm, which was after Aquino returned at about 9:50 p.m.  After Reynosa arrived, she returned Aquino's car keys to Jackie.  (Exh. 7 at 13-14.)..Nikki stated in her declaration that she would have testified to the following: (1) Jackie and Castaneda were present in the apartment when she arrived

United States District Court
Northern District of California

there between 8:30 and 9:30 p.m. on the day of the robbery; (2) Meija and Reynosa were not there when she arrived; (3) Meija and Reynosa returned around 10 p.m., after Aquino arrived; (4) after Reynosa arrived, she gave Aquino's car keys to Jackie; and (5) Reynosa was carrying a purse Nikki had not seen before.  (Exh. 7 at 14.)  In the motion for a new trial, new counsel submitted his declaration stating that trial counsel told him that he had interviewed Jackie himself but that he did not have any notes or report regarding his conversation with her.  New counsel declared that trial counsel stated that he had not called Jackie to testify because he believed she had lied during her taped jail conversations and that he was concerned about her testimony.  (Exh. 7 at 13.)

The Court of Appeal denied this claim finding that counsel had made a tactical decision not to call Jackie as a witness and that there was no prejudice from counsel's failure to call Nikki because nothing in her declaration would have contradicted or impeached the evidence that implicated Castaneda.  (Exh. 7 at 15-16.)  This determination was not objectively unreasonable.

Tactical decisions of trial counsel deserve deference when: (1) counsel bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*, 466 U.S. at 689-91."  *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997).

Not only did counsel interview Jackie, but he also heard the tapes of her telephone conversations with Castaneda when Castaneda was in jail.  Counsel stated that he considered calling Jackie as a witness, but was concerned about her credibility.  This qualifies as a strategic decision based upon investigation.  The choice appears to be reasonable under the circumstances and deserves deference.  Therefore, counsel's decision not to call Jackie does not constitute deficient performance.

Furthermore, Castaneda cannot show prejudice from counsel's failure to call Nikki as a witness because her statement that Castaneda was at the apartment at 8:30 or 9:30 p.m.

does not undermine the jury's verdict that he robbed Stickler at 6:45 p.m.  Her proffered testimony was also cumulative because Aquino testified that Jackie, Nikki and Castaneda were at Jackie's apartment when he arrived after work at about 9:45 p.m. and that Meija and Reynosa arrived at about 10:00 p.m.  Further, as discussed previously, and as found by the Court of Appeal, the evidence that Castaneda robbed Stickler was strong.  Therefore, Castaneda does not establish a reasonable probability that the result of the trial would have been different had counsel called Nikki as a witness.  The Court of Appeal's denial of this claim was not objectively unreasonable.

### C.      Failure to Object to Admission of DNA Evidence

Castaneda contends that counsel rendered ineffective assistance for failing to object to the admission of testimony regarding his DNA testing.

Trial counsel cannot have been ineffective for failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996); *see, e.g.*, *Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of defendant's prior sexual misconduct as propensity evidence not ineffective where evidence would have been admitted to show common plan or intent).  Whether an attorney's actions were tactical is a question of fact, which a federal habeas court must uphold, unless it finds the state court's factual determination was objectively unreasonable.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007).

The Court of Appeal determined that counsel's performance was not ineffective, as follows:

> Although the prosecution presented evidence that defendant was arrested, booked into jail, and had a DNA swab taken that was later used as a sample to test whether his DNA could be found on the seized ski mask, gun, and cartridges, the prosecution did not present evidence regarding the circumstances under which the DNA swab was obtained and transported to the lab where it was used for the tests.  Therefore, defendant contends that his trial counsel rendered ineffective assistance by failing to object to the admission of testimony regarding the DNA testing.
>
> "In a chain of custody claim, the burden on the party offering

United States District Court
Northern District of California

1
2
3
4
5
6

the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight. . . ." (*People v. Catlin* (2001) 26 Cal. 4th 81, 134.)

7
8
9

"Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference, failure to object seldom establishes counsel's incompetence." . . .

10
11
12
13
14
15
16
17
18
19
20
21

In this case, defendant's counsel did not claim below that a tampering, or even a possibility of a tampering, occurred with defendant's DNA swab before it was used by the criminalist at the lab as a comparison with the DNA found on the ski mask, gun, and cartridges. Nor did counsel enter foundational or chain of custody objections to the criminalist's testimony. (*Compare People v. Jimenez* (2008) 165 Cal. App. 4th 75, 79-81.) Accordingly, the trial court properly admitted the criminalist's testimony "and let what doubt remains go to its weight." (*People v. Catlin*, 26 Cal. 4th at 134.) In addition, as the reason for defendant's counsel failure to raise a chain of custody objection does not appear on the record, and we can conceive of a tactical reason for counsel's failure to object, we will not find ineffective assistance of counsel. As defendant acknowledges, defendant's counsel had the ski mask independently tested for DNA, so he was aware of the results of that testing as well as the credibility of the criminalist's testimony regarding her lab's DNA testing. And, the DNA test results were favorable to defendant. Counsel may have decided under the circumstances either that he did not want to impeach the criminalist's testimony or that any objection to the chain of custody evidence would not have impeached the criminalist's testimony.

22

(Exh. 7 at 21-23.)

23

The Court of Appeal's determination that counsel had a strategic reason for not

24

objecting to the DNA evidence based on chain of custody was not objectively

25

unreasonable. No evidence indicated that Castaneda's DNA swab was ever out of the

26

control of the police or the criminalist at the lab or that the evidence was tampered with.

27

Defense counsel had the ski mask independently tested for DNA and was, therefore, aware

28

whether the prosecutor's criminalist's testimony pertaining to the results of the lab's testing

1   was credible.  Based on this, the Court of Appeal reasonably determined that counsel could

2   have concluded that a chain of custody objection would have been denied or would not

3   have impeached the criminalist's testimony.

4         Furthermore, Castaneda cannot establish prejudice.  The criminalist testified that

5   Castaneda was excluded as a major contributor to the DNA on the revolver and that the

6   DNA on the cartridges was insufficient for testing.  The DNA on the ski mask only

7   showed that Castaneda could not be excluded as a possible contributor.  Therefore, the

8   criminalist's DNA testimony did not weigh heavily in finding that Castaneda was guilty of

9   robbing Stickler.  However, other evidence tied Castaneda to the ski mask.  The evidence

10  that was the most incriminating was Castaneda's own telephone conversations from jail.  In

11  one of these conversations, Castaneda admitted that he knew the revolver was in Garabai's

12  bag and that the gun was in the ski mask, which also was in the bag.  (Reporter's Transcript

13  ("RT") 556, 570-71.)  In another telephone conversation with Jackie, Castaneda asked if

14  the police had found the ski mask.  (RT 598.)  In light of this evidence, it is not reasonably

15  probable that the result of the proceeding would have been different had counsel objected

16  to the DNA evidence and it had been excluded.  Accordingly, the Court of Appeal

17  reasonably determined that counsel was not ineffective for failing to object to the DNA

18  evidence.

19        In his petition, Castaneda cites *People v. Lucas*, 12 Cal. 4th 415 (1995) and *People*

20  *v. Jimenez*, 165 Cal. App. 4th 75 (2008), for the proposition that the chain of custody

21  evidence was insufficient to support admission of the DNA evidence.  In *Lucas*, 12 Cal.

22  4th at 445-46, the California Supreme Court noted that "it is common and proper for

23  counsel to stipulate to the chain of custody" because "flaws in the chain are often mere

24  technical omissions that competent counsel may consider unworthy of extended debate.  In

25  fact, an objection on chain of custody grounds may be less productive for defendant than a

26  decision to permit the prosecutor to establish a shoddy chain of custody that can be pointed

27  out to the jury in the hope of giving rise to reasonable doubt."  Thus, *Lucas* does not

28  support Castaneda's claim that counsel was ineffective for failing to object on the basis of

United States District Court
Northern District of California

14

chain of custody evidence.

In *Jimenez*, 165 Cal. App. 4th at 79-81, the trial court overruled counsel's objection to the chain of custody regarding the defendant's DNA when the technician who could have testified to the chain of custody was on vacation.  On appeal, the court held that the trial court's overruling of counsel's objection was an abuse of discretion and, because the identification evidence against the defendant was so shaky, the wrongful inclusion of the DNA evidence was prejudicial.  *Jimenez* is distinguishable.  It was a direct appeal and not a federal habeas case where AEDPA's deferential standards must be followed.  Also, it did not address the claim Castaneda raises in this petition, ineffective assistance of counsel. Here, Castaneda fails to overcome the strong presumption that counsel's failure to raise a chain of custody objection was within the wide range of reasonable professional conduct. The Court of Appeal's denial of this claim was not objectively unreasonable.

## II.    Insufficient Evidence Supporting Burglary Conviction

Castaneda argues that insufficient evidence supported his burglary conviction.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. *Jackson v. Virginia*, 443 U.S. 307, 326 (1979).  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  *See Jackson*, 443 U.S. at 324.  The Supreme Court has recently emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . ."

United States District Court
Northern District of California

1    *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam).

2         Under AEDPA, a federal habeas court applies the standards of *Jackson* with an

3    additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

4    Generally, a federal habeas court must ask whether the operative state court decision

5    reflected an unreasonable application of *Jackson* to the facts of the case. *Coleman*, 132 S.

6    Ct. at 2062; *Juan H.*, 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)).  To grant relief, a

7    federal habeas court must conclude that "the state court's determination that a rational jury

8    could have found that there was sufficient evidence of guilt, i.e., that each required element

9    was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*,

10   659 F.3d 957, 964-65 (9th Cir. 2011).

11        Sufficiency of the evidence claims, on federal habeas review, is performed with

12   reference to the substantive elements of the criminal offense as defined by the state law.

13   *Jackson*, 443 U.S. at 324 n.16.  Federal courts are bound by state court rulings on issues of

14   state law. *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the

15   last word on the interpretation of state law."); *Melugin v. Hames*, 38 F.3d 1478, 1487 (9th

16   Cir. 1994) (federal habeas court is bound by state court's interpretation of state law).

17        The California Court of Appeal determined that sufficient evidence supported the

18   burglary conviction, as follows:

19            Defendant now contends that, when he entered the store with
20            the stolen $150 gift card, "he lacked the necessary intent to
             steal and his conviction must be reversed."  This is so, he
21            argues, because "[b]y law, it was Stickler, not Ann Taylor who
             owned the value of the gift card," "the card could be used in
22            the store as cash," and "[n]o evidence established that Ann
             Taylor was a victim or lost any money because Stickler had
23            prepaid for the card."  "[W]hen [defendant] took the gift card
             from [Stickler] (and reached a place of temporary safety), the
24            robbery and theft were complete and could not support a
             separate conviction for burglary."

25            "The crime of burglary consists of an act-unlawful entry-
26            accompanied by the 'intent to commit grand or petit larceny or
             any felony.'" (*People v. Montoya* (1994) 7 Cal. 4th 1027,
27            1041, 31, quoting § 459.)  Under the federal Constitution's due
             process clause, there is sufficient evidence to support
28            defendant's conviction if, viewing the evidence in the light
             most favorable to the prosecution, a rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) . . .

We agree with defendant's premise that the robbery and the theft of the Ann Taylor Loft gift card from Stickler were complete when defendant reached a place of temporary safety. However, we disagree with defendant's premise that defendant's intended use of the stolen gift card in the Ann Taylor Loft store, knowing that the card was stolen, could not support his burglary conviction. Just as the theft of an access card (§ 484e) and the later unlawful use of that stolen card to purchase items from a store (§ 484g) can support convictions on separate counts of robbery and burglary (*see, e.g., People v. Tai* (1995) 37 Cal. App. 4th 990), so too can the theft of the gift card in this case and the later use of that stolen card to purchase items support defendant's separate convictions for robbery and burglary here. That Stickler, not the store, was ultimately the victim of defendant's use of the value of the stolen gift card does not necessitate a finding that defendant did not have the intent to commit theft when he entered the store.

Unlike with cash, the police were able to trace the stolen gift card defendant used to purchase the items from that store to Stickler, as the gift card had been purchased with Stickler's debit card. It was the monetary value of that stolen card that defendant intended to use during the burglary which supports the finding that defendant entered the store with the intent to commit theft. The evidence amply supports defendant's conviction for burglary.

(Exh. 7 at 20-21.)

Castaneda was convicted of burglary, which is defined, under California law, as the entering into any structure, including a store, with the intent to commit grand or petit larceny or any felony. Cal. Penal Code § 459. Larceny is defined, in relevant part, as the stealing, taking, or carrying away of the personal property of another. Cal. Penal Code § 484(a).

Castaneda argues that the Court of Appeal's denial of his claim was unreasonable because he could not have the intent to take property from the Ann Taylor Loft store because the gift card was purchased by Stickler and, thus, the loss was Stickler's not the Ann Taylor Loft store's. Castaneda further contends that the Court of Appeal unreasonably compared the gift card with an access card because the two types of cards are governed by different statutes and have different features -- an access card allows a person

17

to gain entry to an account from which that person can obtain money or other things of value, whereas a gift card is prepaid and, thus, is similar to cash.

Unfortunately for Castaneda, the gift card was not like cash because the police were able to trace it to Stickler, who recently had purchased it. And, in turn, the gift card led the police to Castaneda, who used it to purchase items in the Ann Taylor Loft store. The Court of Appeal focused on the "intent to steal" element of burglary. The court was satisfied that when Castaneda entered the Ann Taylor Loft store with the intent to use the monetary value of the stolen gift card to purchase merchandise, the intent element of the burglary statute was satisfied. The Court of Appeal's determination of this claim was not objectively unreasonable. Furthermore, on habeas review, this Court is bound by the state court's interpretation of its own criminal statute. *See Mendez*, 298 F.3d at 1158. Accordingly, Castaneda is not entitled to habeas relief on this claim.

## III.    Confrontation Clause Claim

Castaneda contends that his right to confront witnesses against him was violated by the admission of a criminalist's testimony about the results of the DNA testing of the ski mask by her own laboratory and by an independent laboratory because she had not personally performed the testing and the court did not qualify her to testify as an expert. Respondent argues that the claim regarding Aceves' testimony based on her own laboratory's report is procedurally defaulted and, if addressed on its merits, it must be denied.

The California Court of Appeal summarized the facts relevant to this claim as follows:

> Margaret Aceves, a criminalist supervisor at the Richmond lab, described for the jury her education and experience, then testified that she received the swabs from the revolver and cartridges and the cutting from the ski mask. The ski mask cutting had DNA from three individuals. Defendant could not be excluded as a possible contributor to one of the two major DNA profiles. The other major DNA profile belongs to Meija, as reported by the CODIS, "the national data bank system." Defendant could be excluded as a major contributor to the DNA detected on the revolver.

Margaret Aceves further testified that she reviewed a lab report from an independent DNA analysis of a different sample from the same ski mask and revolver, and she read the results of the lab report to the jury.  Based on that lab report, she found that defendant and Meija could not be excluded as potential contributors to the DNA found on the ski mask but Meija could be excluded as a major contributor to the DNA on the revolver.

When the prosecutor turned Aceves' attention from the revolver to the cartridges, defendant's counsel raised an objection:  "I'm going to make a late objection.  I would like to object to the testimony wherein she says that Mr. Meija's DNA could be excluded based on a reading of a report from forensic analysis.  FN9  Now my understanding is she didn't have a sample of the tests, so she's reading the forensic analysis report and stating that based on the hearsay report.  So I'm going to object to it based on that.  Sounds like she's saying she didn't have something to test it against.  She's reading a report and making that assumption. So I'm objecting and making a motion to strike on that basis."  The court stated that it was "going to take the objection under submission.  You can cover it in cross-exam.  I may strike the testimony based on that." Defense counsel responded, "Thank you, your Honor."

 FN9  The name of the independent lab that defendant had requested a DNA report from was Forensic Analytical Sciences.

The prosecutor then returned to the issue of Aceves's lab's examination of the cartridges for DNA, and Aceves responded that no comparisons to defendant's DNA were made due to insufficient results.  When the prosecutor asked if her answer would be the same regarding Meija's DNA, defendant's counsel objected:

"[DEFENSE COUNSEL]: I'm going to object because the witness now appears to be reading from a document.  I don't know what the document is.  A document is itself hearsay, but she's reading from a document.  I would ask that she first identify that she's reading from a document.  I'd like to know what the document is.

"THE COURT:  Are you reading from a document?

"THE WITNESS:  Yes. I'm reading from the report.

"THE COURT:  It's your report?

"THE WITNESS:  My review of the report.

"THE COURT:  So the report that was developed by your laboratory?

"THE WITNESS:  Yes.

"THE COURT:  You may continue."

1

2

3

4

When the prosecutor asked Aceves whether it was possible for an individual to have contact with an item without leaving detectable DNA, defense counsel again objected:  "Objection, calls for speculation.  There's no designation of the expert witness, and no reason to ask hypotheticals."  The court overruled the objection, and Aceves answered the question.

5

6

7

8

9

10

11

12

13

On cross-examination, defense counsel asked Aceves whether the report she had been reviewing "was prepared by your office."  When she responded that it had been, counsel asked, "You didn't prepare it did you?"  Aceves responded, "Actually typed it, no."  Defense counsel asked, "Okay.  It doesn't have your name on it, does it?"  Aceves responded, "I believe it has my initials on it.  That's a different case."  Defense counsel then asked, "Okay.  Now, in this report you indicate that you found this mixture of at least three individuals on the swab from the gun grip, correct?"  When Aceves stated that she would need to look at the report to refresh her memory, defense counsel showed her the report and she responded.  Later, when defense counsel asked Aceves how she excluded Meija as being a major contributor without having a sample from him, Aceves responded that she was "relying on the results that CODIS said that the profile that we submitted is of Tony Meija. . . ."  Aceves testified that she had "read" the report from CODIS, that she "did not prepare it."

14

15

16

17

18

19

20

Defense counsel then stated: "Your Honor, I would ask the Court rule on my motion.  I make a motion to strike that answer as hearsay coming from a separate report other than the report prepared by her office and by her."  The court responded, "The motion is denied.  My understanding of the situation is you're accepting the inclusion of, or the nonexclusion of Tony Meija based in regard to the firearm-excuse me-in regard to the ski mask based on the CODIS report.  So she's just saying that the profile that they got off the ski mask of Tony Meija is different than the profile that could potentially be Tony Meija on the gun.  She's saying those two can't be the same person."

21

22

23

24

25

26

27

Defense counsel then asked Aceves if she was "sure that Tony Meija's DNA is not on the gun," and Aceves responded: "That's a hard question to answer because, you know, once again we did not do a direct comparison.  We are relying on CODIS results.  And our laboratory did generate that CODIS report saying that CODIS told us that there was a match, and that was--if I can read that sentence from the report that we generated and I signed.  As previously reported, the short tandem repeat profile determined from one of the cuttings from the interior of the mask . . . was submitted to the combined DNA index system, CODIS.  A 15-locus match was identified between this case evidence and felon Tony Ralph Meija. . . . That report was generated by our laboratory

(Exh. 7 at 23-26.)

28

**A. Procedural Default**

The California Court of Appeal held that the Confrontation Clause claim was procedurally defaulted:

> Defendant now contends that Aceves could not properly testify "about results obtained by unknown persons in her laboratory without violating the hearsay rule and violating [defendant's] right to confrontation under the Sixth and Fourteenth Amendments." Specifically, defendant argues that, because Aceves was not offered or qualified as an expert witness, she could not read from or rely on lab reports during her testimony that were not personally prepared by her.
>
> . . .
>
> In the case before us, Aceves testified that she was a criminalist supervisor at a lab that did the DNA testing, and she explained her training and experience. The prosecutor did not specifically offer her as an expert witness but the court overruled the defense's objection to her review of lab reports as an expert witness. Aceves testified she reviewed the test results from her lab and she initialed her report, but she did not type it. During her direct examination, when the prosecutor asked her about the test results, she reviewed both her own "notes" and the report "developed by [her] laboratory." The court gave defendant the opportunity during cross-examination to establish that Aceves was not qualified to testify as an expert witness and that the reports did not qualify as business records, but he did not attempt to do so. Therefore, he has waived any claim that Aceves did not qualify as an expert witness or that the reports do not qualify as business records. On this record, we cannot say that the trial court erred in allowing Aceves to testify regarding the contents of the lab report prepared by her laboratory even though she was not formally qualified as an expert witness.

(Exh. 7 at 26-29.)

The doctrine of procedural default bars a federal habeas court from reviewing a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment," *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), unless the petitioner can show cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice, *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977). The Ninth Circuit has held that California's failure-to-object procedural bar is an independent and adequate bar prohibiting federal habeas review of the

claim at issue.  *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995).  The right to confront a witness may be waived, including by failing to object to the admission of the evidence; and states may adopt procedural rules governing objections. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313 n.3 (2009).  In a habeas proceeding, the Confrontation Clause claim may be procedurally barred if the petitioner raised only an evidentiary, not a constitutional, objection at trial.  *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2003).

The Court of Appeal determined the confrontation claim was procedurally defaulted because counsel had failed to base his objection on Castaneda's right to confront witnesses.  Because the Ninth Circuit has held that California's failure-to-object rule is an independent and adequate bar prohibiting review of the claim in habeas proceedings, Castaneda's confrontation claim is procedurally barred.  *See Rich*, 187 F.3d at 1070; *Davis*, 384 F.3d at 654.

In his traverse, Castaneda argues that, if the claim is procedurally barred, it is due to counsel's ineffectiveness and the Court should consider this another ineffective assistance of counsel claim.  Castaneda cannot add another claim in his traverse that has not been exhausted in state court or briefed by Respondent.  Furthermore, although ineffective assistance of counsel may provide the cause necessary to overcome a procedural bar, under these circumstances, Castaneda's argument that his counsel may have been ineffective does not provide the necessary cause.

To serve as "cause," the claim of ineffective assistance of counsel must have been presented as an independent claim to the state courts.  *Murray v. Carrier*, 477 U.S. 478, 489 (1986).  A procedurally defaulted ineffective assistance of counsel claim is not cause to excuse the default of another habeas claim unless the petitioner can satisfy the cause and prejudice standard with respect to the ineffective assistance of counsel claim itself. *Edwards v. Carpenter*, 529 U.S. 446, 451-51(2000); *Cockett v. Ray*, 333 F.3d 938, 943 (9th Cir. 2003).  Recently, the Supreme Court recognized that ineffective assistance of

counsel or no counsel at all, in an initial review post-conviction proceeding may establish cause for a prisoner's failure to bring a claim of ineffective assistance of counsel. *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).  Under *Martinez*, to establish cause, a petitioner must show that post-conviction counsel was ineffective under *Strickland* for not raising a claim of ineffective assistance of trial counsel, and also that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one.  *Sexton v. Cozner*, 679 F.3d 1150, 1155-56, 1157-59, 1160 (9th Cir. 2012).

Because Castaneda belatedly makes this claim of ineffective assistance of counsel for the first time in his traverse and does not provide reasons for his failure to submit it to the state courts, it does not provide the cause necessary to overcome the procedural bar. Furthermore, Castaneda cannot show prejudice because, as discussed below, the claim fails on its merits.

### B. Merits

#### 1. Aceves' Testimony Based on Her Laboratory's Report

Because Respondent has briefed the merits of the claim, in the interests of justice, the Court also will address the merits.  In light of the fact that no state court addressed the merits of this claim, this Court reviews it *de novo*.  *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*  The Confrontation Clause applies to all "testimonial" statements.  *Id.* at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or

United States District Court
Northern District of California

1    proving some fact."  *Id.* at 51.

2           When the primary purpose of taking an out-of-court statement is to create an out-of-

3    court substitute for trial testimony, the statement is testimonial hearsay and *Crawford*

4    applies.  *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011); s*ee, e.g., Bullcoming v. New*

5    *Mexico*, 131 S. Ct. 2705, 2712-14 (2011) (concluding that forensic lab report, prepared in

6    connection with a criminal investigation, certifying that petitioner's blood alcohol level

7    was above limit for aggravated DUI was testimonial); *Melendez-Diaz*, 557 U.S. at 310,

8    329(finding affidavits reporting results of forensic analysis testimonial under *Crawford*

9    because they were made under circumstances where an objective witness would

10   reasonably believe they would be used at trial); *United States v. Bustamante*, 687 F.3d

11   1190, 1194 (9th Cir. 2012) (document which in essence was an affidavit testifying to the

12   contents of birth records of a city is functionally identical to live, in-court testimony that an

13   employee of city might have provided and, therefore, is a testimonial statement); *Williams*

14   *v. Illinois*, 132 S. Ct. 2221, 2243 (2012) (expert testimony regarding a laboratory report

15   written by non-testifying analysts did not violate the Confrontation Clause -- the lab report,

16   which was not introduced into evidence, was not testimonial because it (1) had not been

17   "prepared for the primary purpose of accusing a targeted individual . . . or to create

18   evidence for use at trial," and (2) lacked, unlike the lab reports at issue in *Melendez-Diaz*

19   and *Bullcoming*, an affidavit or declaration attesting to the truth of the matters contained in

20   the report).  If a substitute for trial testimony is not the primary purpose, "the admissibility

21   of a statement is the concern of state and federal rules of evidence, not the Confrontation

22   Clause."  *Bryant*, 131 S. Ct. at 1155.

23          In Castaneda's case, Aceves was personally involved in the DNA testing and

24   review process of the DNA on the ski mask.  She testified that she performed the test and,

25   although she did not type the report herself, she initialed and reviewed it.  (RT 215, 218.)

26   This situation is distinguishable from *Melendez-Diaz*, *Bryant* and *Bullcoming* where tests

27   performed for the purpose of incriminating a defendant were introduced at trial without the

28   testimony of the person who performed them.  In those cases, the defendants' confrontation

United States District Court
Northern District of California

24

rights were violated because they did not have the opportunity to cross-examine the individuals who performed the tests.  Here, Aceves performed the test, reviewed and initialed the final report, was present at trial and was subject to cross-examination.  Unlike in *Melendez-Diaz*, *Bryant* and *Bullcoming*, the prosecutor did not introduce the laboratory report into evidence; the only evidence of the laboratory report was Aceves' testimony, which Castaneda was able to confront.  Thus, a *de novo* review of the record shows that Aceves' testimony regarding her laboratory's DNA testing did not violate Castaneda's right to confrontation.

### 2. Aceves' Testimony Based on the Forensic Analytic Sciences Report

The Court of Appeal addressed Castaneda's claim that his confrontation rights were violated by Aceves' testimony based on the Forensic Analytic Sciences report and determined that, even if this testimony violated Castaneda's confrontation rights, any error was harmless beyond a reasonable doubt.  (Exh. 7 at 29.)

Aceves' testimony based on the Forensic Analytic Sciences report did not violate Castaneda's confrontation rights because the laboratory was hired on behalf of Castaneda for the purpose of obtaining exculpatory evidence, not to obtain evidence against him.  *See Williams v. Illinois*, 132 S. Ct. at 2243 (lab report not made for purpose of incriminating defendant was non-testimonial).

Furthermore, as reasonably found by the Court of Appeal, the lack of opportunity for cross-examining the person who performed the DNA testing for Forensic Analytic Sciences did not prejudice Castaneda.  Under federal habeas review, the prejudice standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had a substantial and injurious effect or influence upon the jury's verdict.  *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637).
A prejudice analysis for confrontation clause errors considers the importance of the witness' testimony in the prosecutor's case, whether the testimony was cumulative, whether other evidence corroborated or contradicted the testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecutor's case.

1   *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

2          Castaneda does not explain how the lack of opportunity to cross-examine the person

3   who performed the Forensic Analytic Sciences test affected the verdict.  Rather, the

4   evidence shows that no prejudice flowed from Castaneda's inability to cross-examine this

5   witness.  As pointed out by the Court of Appeal, both Aceves' laboratory and the Forensic

6   Analytic Sciences laboratory concluded that neither Castaneda nor Meija could be

7   excluded as contributors to the DNA found on the ski mask.  Most importantly, both labs

8   excluded Castaneda as a contributor to the DNA found on the revolver, which was

9   favorable evidence to him.  Thus, Aceves' testimony regarding the second laboratory

10  report was cumulative to her testimony regarding her laboratory's report.  Also, as noted

11  above, other evidence connected Castaneda to the ski mask.  Under these circumstances,

12  any lack of opportunity to cross-examine the individual who performed the Forensic

13  Analytic Sciences test did not have a substantial and injurious effect or influence on the

14  jury's verdict.  Therefore, the Court of Appeal's determination of no prejudice was not

15  objectively unreasonable.  This claim is denied.

16                                    **CONCLUSION**

17          The state court's adjudication of Castaneda's claims did not result in decisions that

18  were contrary to, or involved an unreasonable application of, clearly established federal

19  law, nor did they result in decisions that were based on an unreasonable determination of

20  the facts in light of the evidence presented in the state court proceeding.  Accordingly, the

21  petition is DENIED.

22          A certificate of appealability will not issue.  Reasonable jurists would not "find the

23  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

24  *McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability

25  from the Ninth Circuit.

26  //

27  //

28  //

United States District Court
Northern District of California

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:** November 22, 2013



WILLIAM H. ORRICK
United States District Judge